1
2
3
4
5
6
7
8

# IN THE UNITED STATES BANKRUPTCY COURT

## FOR AND IN THE DISTRICT OF ARIZONA

In re:

NORTH COUNTRY HEALTH CARE, INC.,

Debtor.

Case No. 3:25-bk-12293-DPC

Chapter 11 Proceeding

**FINAL ORDER AUTHORIZING DEBTOR (A) TO OBTAIN POST-PETITION SECURED FINANCING, AND (B) TO UTILIZE CASH COLLATERAL**

Upon the "Emergency Motion for Interim and Final Orders: (i) Authorizing Debtor to Obtain Post-Petition Financing on a Secured Basis and With A Superpriority Administrative Claim; (ii) Granting Interim and Additional Relief; and (iii) Scheduling a Final Hearing Under Bankruptcy Rule 4001(c)" (the "**DIP Motion**"), of North Country Health Care, Inc., as debtor and debtor-in-possession, in the above-referenced case (the "**Chapter 11 Case**"), seeking entry of a final order (this "**Final Order**") pursuant to sections 105, 361, 362, 363, 364, 365, 507, and 552 of Chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "**Bankruptcy Code**"), and Rules 2002, 4001, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**")

and Rule 4001-3 of the Local Rules of Bankruptcy Procedure for the District of Arizona (the "**Local Rules**"), through which North Country Health Care, Inc. (the "**Debtor**" or "**Borrower**") sought the following relief, among other things:

> (i)    authority to obtain a senior secured, super-priority, multiple draw term loan credit facility (such facility, the "**DIP Facility**" from the DIP Lender,[1] and the obligations (including the fees and expenses incurred by the Administrative Agent (as defined below), the "**DIP Obligations**") consisting of new money commitments in an initial aggregate principal amount of up to $1 million (the "**DIP Term Loan**") of which (a) $300,000 of the DIP Term Loan was funded upon entry of the Interim Order [Dkt. No. 42] approving the DIP Facility and the

---

[1]    "**DIP Lender**" refers to a to be formed syndicate of lenders, including the NARBHA Institute and Northern Arizona Healthcare, who shall severally agree to provide the DIP Term Loan based on their pro rata Commitment Amount percentage described in the table below. While the term is defined herein in the singular, it means not only the collective syndicate, but also each and every individual lender in the syndicate. In furtherance thereof, the NARBHA Institute shall be (and hereby is) appointed by each DIP Lender to act on the DIP Lender's behalf as the agent (the "**Administrative Agent**") to collect and service the DIP Term Loan and to take such actions on its behalf and to exercise such powers consistent therewith, in accordance with the DIP Term Sheet and the DIP Orders (as defined below), together with such actions and powers as are reasonably incidental thereto. The Administrative Agent shall also act as the "collateral agent" with respect to the liens granted to the Administrative Agent on behalf of the DIP Lender, and each DIP Lender hereby irrevocably appoints and authorizes the Administrative Agent to act as the agent of such DIP Lender for purposes of acquiring, holding, and enforcing any and all liens on the DIP Collateral (as defined below) to secure any of the DIP Obligations, together with such powers and discretion as are reasonably incidental thereto. The Administrative Agent shall not be subject to any fiduciary or other implied duties, regardless of whether a default has occurred and is continuing, and shall not be liable for any action taken or not taken by it with the consent or at the request of the DIP Lender. The Administrative Agent may perform any and all of its duties and exercise its rights and powers hereunder or under any other DIP Document (as defined below) by or through any one or more sub-agents appointed by the Administrative Agent. A DIP Lender may assign its DIP Term Loan only with the consent of the Administrative Agent and any other DIP Lender. As of the Closing Date (as defined below), the DIP Lender shall be as set forth in the table immediately below, and no DIP Lender shall be required to make any DIP Term Loan in excess of its Commitment Amount:

| DIP Lender | Commitment Amount | Commitment Percentage |
|---|---|---|
| The NARBHA Institute | $500,000 | 50% |
| Northern Arizona Healthcare | $500,000 | 50% |

use of cash collateral previously entered in the Chapter 11 Case (the "**<u>Interim Order</u>**," and any draw pursuant to the Interim Order, an "**<u>Interim Draw</u>**"),[2] subject to the conditions precedent set forth in the Interim Order, and (b) the remainder of the DIP Term Loan shall be funded, subject to the conditions precedent set forth in this Final Order, which shall include terms and conditions similar to and consistent with the "Conditions Precedent to Interim Draws and Final Draw" and "Chapter 11 Case Milestones" set forth below, upon or following entry of this Final Order approving the DIP Facility (including the DIP Term Loan and all DIP Lender fees related thereto), which order(s) must be satisfactory to the DIP Lender collectively, the "**<u>DIP Orders</u>**")[3] and the satisfaction of any other conditions to draw as set forth herein in amounts not to exceed those set forth in and in accordance with the Budget (as defined below) or the Commitment Amount of each DIP Lender,[4] pursuant to the terms of (a) the Interim Order and this Final Order, and (b) if required by the Administrative Agent and the DIP Lender, a credit agreement and related security documentation (*i.e.*, Deeds of Trusts and Security Agreement) together with any subsequent amendments, modifications, supplements, or additional documentation related thereto (collectively, the "**<u>DIP Documents</u>**");

(ii)    authority and direction to grant, pursuant to sections 364(c)(2) and 364(c)(3) of the Bankruptcy Code, continuing, valid, binding, enforceable, non-avoidable,

---

[2]     The Interim Order approving the DIP Facility authorized and approved (i) the Interim Draw; (ii) the making of the DIP Term Loan; and (iii) the granting of the super-priority claims and liens against the Debtor and its assets in accordance with the DIP Term Sheet (as defined below) with respect to the DIP Collateral (as defined below).

[3]     This Final Order approving the DIP Facility is in form and substance acceptable to the DIP Lender and, among other things, authorizes and approves the DIP Facility on a final basis, and the total amount of the Commitment Amount. The conditions precedent to each DIP Lender funding its Commitment Amount shall be the satisfaction of the items described herein.

[4]     Up to an aggregate amount not to exceed the DIP Term Loan, may be borrowed by the Borrower during the Availability Period (as defined below), in each case subject to the terms and conditions provided herein (each, an "**<u>Extension of Credit</u>**"). Each DIP Lender will fund the DIP Term Loan into the account(s) designated by the Borrower. Such accounts will be subject to the DIP Liens (as defined below) in favor of the DIP Lender.

4905-2284-6344,

4899-3911-8472, v. 2

and automatically perfected, post-petition security interests and liens (the "**DIP Liens**") on cash, all tangible, intangible, real property, and personal property of the Borrower (including, without limitation, all pre-petition and post-petition property and assets of the Borrower and all equity interests owned by the Borrower and any insurance proceeds), and all other property of the Borrower of whatever kind, nature or description, whether acquired or created pre-petition or post-petition to secure the DIP Obligations, and the proceeds of each of the foregoing (including, without limitation, proceeds from the disposition of real property, including non-residential leaseholds) (the "**DIP Collateral**"); the DIP Liens shall be subject only to (a) the Carve-Out (as defined below), and (b) validly perfected and non-avoidable liens existing as of the Petition Date (as defined below), which liens are listed in <u>Exhibit 1</u> to this Final Order (collectively, the "**Pre-Petition Permitted Liens**");

(iii)   authority to use the DIP Lender's "cash collateral," as such term is defined in section 363 of the Bankruptcy Code (the "**Cash Collateral**"), including, without limitation, Cash Collateral in which the DIP Lender has a lien or other interest, whether arising pursuant to this Interim Order or otherwise;

(iv)   vacating the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Documents (if applicable) and this Final Order;

(v)   authority of the DIP Lender to exercise remedies upon the occurrence and continuance of an Event of Default after written notice and as further specified in this Final Order; and

(vi)   waiving any applicable stay (including under Bankruptcy Rule 6004) and provides for the immediate effectiveness of this Final Order.

Having considered the DIP Motion, the Declaration of Anne Newland in support of the First Day Motions, the DIP Documents (if applicable), and the evidence submitted at

- 4 -

the interim hearing (the "**Interim Hearing**") and final hearing (the "**Final Hearing**") on the DIP Motion; having further considered any objections and comments raised by counsel for the parties at the Interim Hearing and Final Hearing; and in accordance with Bankruptcy Rules 2002, 4001(b), 4001(c), 4001(d), and 9014, and all applicable Local Rules, appropriate notice of the DIP Motion, the Interim Hearing, and the Final Hearing having been given; an Interim Hearing having been held and concluded on December 22, 2025 and a Final Hearing having been held and concluded on January 15, 2026; and it appearing that approval of the relief requested in the DIP Motion is necessary to avoid immediate and irreparable harm to the Debtor and its estate and otherwise is fair and reasonable and in the best interests of the Debtor, its creditors, its estate, and all parties in interest, and is essential for the continued operation of the Debtor's business; and after due deliberation and consideration, and for good and sufficient cause appearing therefor:

**IT IS FOUND, DETERMINED, ORDERED AND ADJUDGED that:** [5]

A. **Petition Date**. On December 19, 2025 (the "**Petition Date**"), the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the District of Arizona (the "**Bankruptcy Court**"). The Debtor has continued in the management and operation of its business and property as debtor in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code. No statutory committee of unsecured creditors (to the extent such committee is appointed, the "**Committee**"), trustee or examiner has been appointed in the Chapter 11 Case.

B. **Jurisdiction and Venue**. The Bankruptcy Court has core jurisdiction over the Chapter 11 Case, the DIP Motion, and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157(b) and 1334. Venue for the Chapter 11 Case and proceedings on the DIP Motion is proper before the Bankruptcy Court pursuant to 28 U.S.C. §§ 1408 and 1409. The legal predicates for the relief sought herein are sections 105, 361, 362, 363, 364,

---

[5] Findings of fact shall be construed as conclusions of law, and conclusions of law shall be construed as findings of fact, pursuant to Bankruptcy Rule 7052.

- 5 -

and 507 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6004, and 9014 and the Local Rules.

C. **Interim Order**. Based upon the DIP Motion, and the evidence submitted or proffered at the Interim Hearing, the Court entered the Interim Order approving the DIP Facility on an interim basis. Pursuant to the Interim Order, the Debtor was authorized, among other things, to incur secured borrowings pursuant to the terms of the Interim Order and DIP Documents (if applicable) pending the entry of the Final Order on the DIP Motion.

D. **Notice**. The Final Hearing was held pursuant to the authorization of Bankruptcy Rule 4001 and Local Rule 4001-4. Notice of the Final Hearing and the relief requested in the DIP Motion has been provided by the Debtor, whether by facsimile, electronic mail, overnight courier, or hand delivery, on December 26, 2025, in accordance with the *Order Limiting Notice* [ECF No. 36] and to certain parties in interest, including (a) the Office of the United States Trustee for the District of Arizona (the "**U.S. Trustee**"); (b) the twenty (20) largest unsecured creditors; (c) counsel to the Committee, if one is appointed; and (d) all parties who have filed notices of appearance or requests for notice. Such notice of the DIP Motion, the relief requested therein, and the Interim Hearing and Final Hearing is sufficient under the circumstances.

E. **Findings Regarding the DIP Facility**.

(i) <u>Need for Post-Petition Financing</u>. The Debtor has an immediate need to obtain the DIP Facility and use Cash Collateral, among other things, to permit the orderly continuation of the operation of its business, to maintain business relationships with vendors, suppliers, and patients, to make payroll, to make capital expenditures, and to satisfy operational needs. The Debtor's access to sufficient liquidity through the use of borrowing under the DIP Facility and through the use of Cash Collateral is vital to the preservation and maintenance of the going concern value of the Debtor and to the successful reorganization of the Debtor.

- 6 -

4905-2284-6344,

4899-3911-8472, v. 2

(ii)  <u>No Credit Available on More Favorable Terms</u>.  The Debtor has been and continues to be unable to obtain financing on more favorable terms from sources other than the DIP Lender.  The Debtor is unable to obtain adequate unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense, or, other than from the DIP Lender, secured credit allowable under sections 364(c)(1), 364(c)(2), and 364(c)(3) of the Bankruptcy Code without incurring prohibitive litigation and/or execution expenses that would erode the value of the Debtor's estate and harm all parties in interest.  The Debtor is also unable to obtain secured credit allowable under sections 364(c)(1), 364(c)(2), and 364(c)(3) of the Bankruptcy Code without the Debtor granting to the DIP Lender the rights, remedies, privileges, benefits, and protections provided herein and in the DIP Documents (if applicable), including, without limitation, the DIP Liens (as defined below) (collectively, the "**DIP Protections**").

F.  **Business Judgment and Good Faith Pursuant to Section 364(e)**.

(i)  The DIP Lender has indicated a willingness to provide post-petition secured financing via the DIP Facility to the Borrower in accordance with the DIP Documents (if applicable) and this Final Order.

(ii)  The terms and conditions of the DIP Facility pursuant to the DIP Documents (if applicable) and this Final Order, and the fees paid and to be paid thereunder, are fair, reasonable, and the best available under the circumstances, reflect the Debtor's exercise of prudent business judgment consistent with its fiduciary duties, and are supported by reasonably equivalent value and consideration.

(iii)  Based on the record presented to the Bankruptcy Court at the Interim Hearing and the Final Hearing, the DIP Facility and the DIP Documents (if applicable) were negotiated in good faith and at arms' length among the Debtor, on the one hand, and the DIP Lender, on the other hand, each with the assistance and counsel of their respective advisors, and all of the DIP Obligations shall be deemed to have been extended by the DIP Lender and its respective affiliates for valid business purposes and uses and in good faith,

- 7 -

as that term is used in section 364(e) of the Bankruptcy Code, and in express reliance upon the protections offered by section 364(e) of the Bankruptcy Code, and the DIP Liens shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event this Final Order, or any other order or any provision hereof or thereof, is vacated, reversed, amended, or modified, on appeal or otherwise.

(iv) **Proper Purpose**. The amount of the DIP Term Loan is not conditioned on the volume or value of Federal health care program business generated between the DIP Lender and the Borrower. The Borrower reasonably expects the DIP Term Loan to contribute meaningfully to the Borrower's ability to maintain or increase the availability, or enhance the quality, of services provided to a medically underserved population served by the Borrower. Furthermore, the DIP Lenders are not (i) requiring the Borrower (or its affiliated health care professionals) to refer patients to a particular individual or entity, or (ii) restricting the Borrower (or their affiliated health care professionals) from referring patients to any individual or entity. The Borrower may enter into agreements with other lenders or donors. The Borrower is required to provide effective notification to patients of their freedom to choose any willing provider or supplier and the existence and nature of the arrangement between the DIP Lender and the Borrower.

G. **Relief Essential; Best Interest**. For the reasons stated above, the Debtor has requested immediate entry of this Final Order pursuant to Bankruptcy Rule 4001(b)(2) and 4001(c)(2) and the Local Rules. Absent granting the relief set forth in this Final Order, the Debtor's estate and its ability to successfully reorganize shall be immediately and irreparably harmed. Consummation of the DIP Facility in accordance with this Final Order and the DIP Documents (if applicable) is therefore in the best interests of the Debtor's estate consistent with its fiduciary duties.

**NOW, THEREFORE**, on the DIP Motion and the record before the Bankruptcy Court with respect to the DIP Motion, and with the consent of the Debtor and the DIP

- 8 -

Lender as to the form and entry of this Final Order, and good and sufficient cause appearing

therefor,

IT IS ORDERED that:

1.      **DIP Motion Granted**.  The DIP Motion is granted in accordance with the terms and conditions set forth in the Interim Order and this Final Order and the DIP Documents (if applicable).  Any objections to the DIP Motion with respect to the entry of this Final Order that have not been withdrawn, waived, or settled, are hereby denied and overruled.  The Comprehensive DIP Term Sheet (the "**DIP Term Sheet**") attached to the DIP Motion as Exhibit A is incorporated herein by reference.  To the extent the DIP Term Sheet conflicts with the terms of this Final Order, this Final Order shall control.

2.      **DIP Documents**.

(i)      Approval of DIP Documents (If Applicable).      The terms and conditions set forth in the DIP Term Sheet are ratified, approved, and binding upon the Borrower and its bankruptcy estate.  In addition, if requested or required by the DIP Lender, the Borrower is expressly and immediately authorized and directed to (a) establish the DIP Facility; (b) execute, deliver, and perform under the DIP Documents, in a form acceptable to the DIP Lender in its sole and absolute discretion, and to incur the DIP Obligations in accordance with, and subject to, the terms of the Interim Order, this Final Order, and the DIP Documents; and (c) execute, deliver, and perform under all other instruments, certificates, agreements, and documents which may be required or necessary for the performance by the Borrower under the DIP Facility and the creation and perfection of the DIP Liens described in, and provided by, the Interim Order, this Final Order, and the DIP Documents.  The Borrower is hereby authorized to do and perform all acts, pay the principal, interest, fees, expenses, and other amounts described in the Interim Order, this Final Order, the DIP Term Sheet, and the DIP Documents as such become due pursuant to the Interim Order, this Final Order, the DIP Term Sheet, and the DIP Documents, which amounts shall not be subject to further approval of the Bankruptcy Court and shall be non-

- 9 -

refundable.  Upon their execution and delivery, the DIP Documents shall further state and evidence the valid and binding obligations of the Borrower under the Interim Order, this Final Order, and the DIP Term Sheet and shall be enforceable against the Borrower in accordance with their terms.  Each officer of the Borrower acting singly is hereby authorized to execute and deliver each of the DIP Documents, such execution and delivery to be conclusive of their respective authority to act in the name of and on behalf of the Borrower.

(ii)    Documentation.  Definitive financing documentation shall include (a) the applicable DIP Orders, (b) the DIP Term Sheet, and (c) if required by the Administrative Agent and the DIP Lender, a credit agreement and related security documentation (*i.e.*, Deeds of Trusts and Security Agreement), in a form acceptable to the DIP Lender in its sole and absolute discretion, together with any subsequent amendments, modifications, supplements or additional documentation related thereto (*i.e.*, the DIP Documents).

3.    **Type and Amount of DIP Facility**.  The DIP Term Loan is a secured super-priority debtor-in-possession multi-draw term loan and the obligations (including the fees and expenses incurred by the Administrative Agent) consisting of new money commitments in an initial aggregate principal amount of up to $1,000,000, of which (a) $300,000 of the DIP Term Loan was funded upon entry of the Interim Order; and (b) the remainder of the DIP Term Loan shall be funded following the entry of this Final Order approving the DIP Facility (including the DIP Term Loans and all DIP Lender fees related thereto) subject to the conditions precedent set forth below and the satisfaction of any other conditions to draw as set forth herein in amounts not to exceed those set forth in and in accordance with the Budget (as defined below) or each DIP Lender's respective Commitment Amount.  Up to an aggregate amount not to exceed the DIP Term Loan may be borrowed by the Borrower during the Availability Period (as defined below), in each case subject to the terms and conditions provided herein.  Each DIP Lender shall fund the

- 10 -

DIP Term Loan into the account(s) designated by the Borrower.  Such accounts and all funds therein shall be subject to the DIP Liens in favor of the DIP Lender.

4.    **Closing Date of DIP Facility**.  The closing date of the DIP Facility was the date of the satisfaction, or waiver by the DIP Lender, of the relevant conditions precedent set forth in the Interim Order (the "**Closing Date**").

5.    **Use of Proceeds**.  Proceeds of the DIP Term Loan shall be used in compliance with the terms of an approved budget (the "**Budget**," subject to permitted variances, as set forth in the DIP Orders), in a form and substance reasonably acceptable to the DIP Lender, upon entry of the Interim Order and this Final Order, and subject to the terms of the Interim Order and this Final Order (a) to pay professional fees of the Borrower subject to the limitations of the Budget; and (b) to fund operating expenses as permitted by the DIP Orders and the Budget.  A copy of the Budget is attached as Exhibit 2 and incorporated herein by this reference.

6.    **Availability Period**.  The DIP Term Loan may be drawn during the period from and including the Closing Date up to, but excluding, the occurrence of a Termination Event (as defined below) that has not been waived by written agreement of the DIP Lender, in its discretion (the "**DIP Termination Date**") (such period between the Closing Date and the DIP Termination Date, shall be referred to as the "**Availability Period**").  The DIP Lender's commitment to lend shall expire at the end of the Availability Period (the "**DIP Commitment**").  The Commitment Amount of each DIP Lender shall be permanently reduced on the date of each Extension of Credit by the aggregate principal amount of the DIP Term Loan made on the date of such Extension of Credit.

7.    **Maturity and Termination**.  All DIP Obligations shall be due and payable in full in cash (or such other form of consideration as the DIP Lender and the Borrower may mutually agree) on the earliest of (any such event, a "**Termination Event**") (a) February 16, 2026, or such later date agreed upon in writing by the DIP Lender in its sole and absolute discretion; (b) the closing of any sale or other disposition of all or substantially all

- 11 -

of the assets of the Borrower pursuant to section 363 of the Bankruptcy Code; (c) the effective date of any Chapter 11 plan of reorganization or liquidation with respect to the Borrower (a "**Plan**"); (d) the date of acceleration of the DIP Term Loan and the termination of the commitment of the DIP Lender to make a DIP Term Loan in accordance with the DIP Documents; (e) dismissal of the Chapter 11 Case or conversion of the Chapter 11 Case into a case under Chapter 7 of the Bankruptcy Code; (f) the date an order is entered appointing a Chapter 11 trustee or examiner with enlarged powers; and (g) the date any lender, other than the DIP Lender, provides any commitments or funding, including debtor-in-possession financing, after entry of the Interim Order or this Final Order. The occurrence of the DIP Termination Date shall terminate the ability of the Borrower to borrow any other amounts and shall terminate any further obligation the DIP Lender has to make any DIP Term Loan under the DIP Documents and the DIP Orders. The outstanding principal amount of, and accrued interest on, the DIP Term Loan and all other amounts owing to the DIP Lender, including the fees set forth below, under the DIP Facility shall be payable on the DIP Termination Date, unless already paid pursuant to previous orders.

8.      **Interest Rate**.   The DIP Term Loan shall bear interest at the rate of five percent (5%) per annum, calculated on the basis of a 360-day year, and shall accrue and be payable upon a Termination Event. During the continuance of an Event of Default (as defined below) under this Final Order and the DIP Documents, any amounts outstanding under the DIP Facility shall automatically bear interest at an additional three percent (3%) per annum. All default interest shall be payable on demand or at the DIP Termination Date.

9.      **Payments**.

(i)      Voluntary Prepayments.   Voluntary prepayments of the DIP Term Loan shall be permitted at any time, upon three (3) Business Days prior written notice to the DIP Lender, which notice shall specify the amount of such payment and the date on which such prepayment is to be made. "**Business Day**" means any day other than a Saturday,

- 12 -

Sunday, or other day on which commercial banks in New York City are authorized or required to close.

(ii)     Payments, Mandatory Prepayments, and Prepayments.  The Borrower shall pay or prepay the DIP Term Loan and all other DIP Obligations until such obligations are paid in full immediately as follows (unless waived or extended by the DIP Lender in its sole discretion) subject to prior satisfaction of any applicable valid, perfect, and unavoidable Pre-Petition Permitted Liens (a) one hundred percent (100%) of the net proceeds within two (2) Business Days of any sale or disposition of any assets or equity in a single transaction or a series or related transaction, in each case by the Borrower; (b) one hundred percent (100%) of the net proceeds within two (2) Business Days of any sale or disposition of any of the Borrower's assets pursuant to section 363 of the Bankruptcy Code, simultaneous with the consummation thereof, in each case, by the Borrower; or (c) one hundred percent (100%) of the DIP Term Loan, together with all fees and costs, within two (2) Business Days of any lender other than the DIP Lender providing any commitments or funding after entry of this Final Order.

(a)     Any amounts so paid or prepaid may not be reborrowed.  No reinvestment of the proceeds of any extraordinary receipts, asset sales, or other proceeds described above shall be permitted without the prior written consent of the DIP Lender.

(b)     All payments on the DIP Term Loan, including mandatory payments, prepayments, and proceeds of the DIP Collateral received by the Borrower, or after the exercise of remedies, or after the DIP Term Loan has automatically become immediately due and payable, shall be applied in the following order of priority unless otherwise determined by the DIP Lender in its sole and absolute discretion (a) first, to pay all documented out of pocket expenses of the Administrative Agent, including without limitation, fees and expenses of counsel and external advisors; (b) second, to pay an amount equal to all accrued and unpaid interest owing to each DIP Lender with respect to the DIP Term Loan; (c) third, to pay any principal amounts outstanding with respect to the DIP

- 13 -

Term Loan, including any amounts and interest that have been added to the principal balance thereof; (d) fourth, all other amounts and DIP Obligations in each case owing to the Administrative Agent and each DIP Lender; and (e) fifth, the balance, if any, after all of the amounts described above including the DIP Obligations have been paid in full in cash, consistent with the allowance of the claims of the Administrative Agent (*i.e.*, the NARBHA Institute) and each DIP Lender pursuant to orders entered by the Bankruptcy Court or as otherwise required by law.

10. **Credit Bidding**. Subject to section 363(k) of the Bankruptcy Code, the DIP Lender may credit bid all or any portion of the DIP Lender's claims, including, without limitation, the DIP Obligations and the DIP Claims (as defined below), in connection with any proposed sale of any, all, or substantially all of the Borrower's assets, whether occurring pursuant to section 363 of the Bankruptcy Code or included as part of a plan under section 1123 of the Bankruptcy Code, including a plan subject to confirmation under section 1129(b)(2)(A)(ii) of the Bankruptcy Code, or a sale or disposition by a Chapter 7 trustee for the Debtor under section 725 of the Bankruptcy Code. In connection with any such credit bid by the DIP Lender, the Debtor shall, upon reasonable advance notice by the Administrative Agent, provide for the assignment of the Administrative Agent's (on behalf of each DIP Lender) right to purchase the acquired assets to one or more of the DIP Lender's nominees or a newly formed acquisition vehicle.

11. **Security and Priority**. Pursuant to the Interim Order and this Final Order, the Administrative Agent (as collateral agent for each DIP Lender) has been granted and continues to hold, pursuant to sections 364(c)(1), 364(c)(2), and 364(c)(3) of the Bankruptcy Code, continuing, valid, binding, enforceable, non-avoidable, and automatically perfected, post-petition security interests and liens (*i.e.*, the DIP Liens) on cash, all tangible and intangible real and personal property of the Borrower (including, without limitation, all pre-petition and post-petition property and assets of the Borrower and all equity interests owned by the Borrower and any insurance proceeds), all goods, accounts (except to the

- 14 -

4905-2284-6344
4899-3911-8472, v. 2

extent the creation of a lien therein is prohibited by applicable law), chattel paper, commercial tort claims, deposit accounts, documents, general intangibles, instruments, investment property, letter of credit rights, letters of credit, money, and all other property of the Borrower of whatever kind, nature or description, whether acquired or created pre-petition or post-petition to secure the DIP Obligations, and the proceeds of each of the foregoing (including, without limitation, proceeds from the disposition of real property, including non-residential leaseholds) (*i.e.*, the DIP Collateral).

(i)     The DIP Liens shall be subject only to (i) the Carve-Out (as defined below), and (ii) validly perfected and non-avoidable liens existing as of the Petition Date, which liens are listed in <u>Exhibit 1</u> to this Final Order (*i.e.*, the Pre-Petition Permitted Liens).

(ii)     Upon entry of the Interim Order and this Final Order and subject to the Carve-Out, all obligations of the Borrower under the DIP Documents, including, without limitation, all principal, accrued interest, costs, fees and premiums provided for therein, and all DIP Obligations shall be entitled to super-priority claim status pursuant to section 364(c)(1) of the Bankruptcy Code, with priority over any and all administrative expense claims and unsecured claims, of any kind or nature whatsoever, now existing or hereafter arising under the Bankruptcy Code (the "**<u>DIP Claims</u>**"). All DIP Obligations shall also constitute allowed super-priority administrative expense claims in the Chapter 11 Case and shall have priority over all other claims and administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code.

(iii)     Notwithstanding the foregoing, the DIP Liens shall not extend to, and the DIP Collateral shall not consist of, avoidance actions brought pursuant to Chapter 5 of the Bankruptcy Code or applicable state law equivalents, but shall include the proceeds therefrom.

(iv)     The DIP Liens shall be effective and perfected as to the DIP Collateral upon the entry of the Interim Order (subject to the occurrence of the Closing Date) and without necessity of the execution, filing, or recording of control agreements, financing

- 15 -

statements, or other security agreements or perfection documents. In addition to appropriate orders of the Bankruptcy Court granting and perfecting such liens, if requested or required by the DIP Lender, the Borrower shall take all other commercially reasonable steps (including the execution and filing of UCC financing statements) requested by the DIP Lender with respect to such security interests and liens.

12. **Remedies**. The DIP Lender shall have all remedies customarily available in the Chapter 11 Case including, without limitation, those remedies customarily available to a debtor-in-possession lender, including, without limitation, the rights to (a) declare that the DIP Term Loan is terminated, whereupon any commitment to advance funds under the DIP Term Loan shall be terminated; (b) declare the unpaid amount of the DIP Obligations to be immediately due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by the Borrower; or (c) take any other action or exercise any other right or remedy (including, without limitation, with respect to the DIP Liens in favor of the DIP Lender permitted under the DIP Documents, or by applicable law). Any exercise of remedies by the DIP Lender shall be subject in all respects to the terms of this Final Order. The Debtor waives any right to seek relief under the Bankruptcy Code, including under section 105 thereof, to the extent such relief would restrict or impair the rights and remedies of the DIP Lender set forth in this Final Order and in the DIP Documents.

13. **Conditions Precedent to Interim Draws and Final Draw**. The DIP Facility is subject to the following conditions precedent to borrowings on the date of any Extension of Credit, each of which may be extended or waived by the DIP Lender in its sole and absolute discretion (a) entry of the Interim Order on or before December 31, 2025, which Interim Order shall remain in full force and effect and not be stayed or subject to appeal; (b) all documentation relating to the DIP Facility, including the DIP Documents, shall be in form and substance satisfactory to the DIP Lender, and shall be duly executed and delivered by all parties thereto; (c) other than the Interim Order and this Final Order,

- 16 -

4905-2284-6344
4899-3911-8472, v. 2

there shall not exist any law, regulation, ruling, judgment, order, injunction, or other restraint that prohibits, restricts, or imposes a materially adverse condition on the DIP Facility or the exercise by the DIP Lender of its rights as a secured party with respect to the DIP Collateral; (d) all governmental and third-party consents and approvals reasonably necessary to be obtained by the Borrower in connection with the DIP Facility, if any, shall be obtained (without the imposition of any conditions that are not reasonably acceptable to the DIP Lender in its reasonable discretion) or permitted via the applicable DIP Orders, and shall remain in effect; (e) the DIP Lender shall have a valid and perfected lien on, and security interest in, the DIP Collateral of the Borrower on the basis and with the priority set forth herein; (f) delivery of the initial Budget acceptable to the DIP Lender in its reasonable discretion; (g) except with respect to the initial draw which shall be fully drawn and funded promptly after entry of the Interim Order, and in no event later than two (2) Business Days after entry of the Interim Order, the Borrower shall have delivered to the DIP Lender a customary borrowing notice at least two (2) Business Days prior to the anticipated date of any Extension of Credit; (h) no event which, with the giving of notice or the lapse of time or both, would constitute an Event of Default (as defined below) shall have occurred, and shall be continuing, under the DIP Facility immediately prior to the funding of the DIP Term Loan or would result from such borrowing of the DIP Term Loan; (i) the DIP Term Loan shall be authorized pursuant to the Interim Order and this Final Order; (j) the Borrower shall be in compliance with the DIP Orders; (k) the Borrower shall be in compliance with the approved Budget; and (l) on or before December 31, 2025, the entry of an order providing for bid procedures for the sale of the Debtor's assets, if any, which order shall also permit approval of a stalking horse bid (the "**Bidding Procedures Order**"), which order shall not be stayed or subject to appeal.

(i)     The DIP Lender shall have no obligation to make any DIP Term Loan or make any other extension of credit or financial accommodation with respect to the DIP Facility or otherwise unless and until all conditions precedent to the making of any such

- 17 -

DIP Term Loan or other extension of credit or financial accommodation under the DIP Documents, the Interim Order, and this Final Order have been satisfied in full or waived by the requisite DIP Lender in accordance with the DIP Documents, the Interim Order, and this Final Order.

14. **Events of Default**. The Events of Default are as follows, each of which may be waived by the DIP Lender in its sole and absolute discretion (collectively, the "**Events of Default**" and each an "**Event of Default**") (a) failure to make mandatory payments to the DIP Lender when due; (b) non-compliance with any obligations or covenants set forth herein or in any other DIP Documents, judgments, impairment of security interest in the DIP Collateral or other defaults; (c) failure to comply with any of the Chapter 11 Case Milestones (as defined below); (d) occurrence of any Termination Event; (e) reversal, vacatur, or stay of the effectiveness of the Interim Order or this Final Order; (f) non-compliance, subject to any applicable grace and/or cure periods, by the Borrower with the terms of the applicable DIP Order then in effect; (g) the entry of an order in the Chapter 11 Case granting relief from any stay or proceeding (including, without limitation, the automatic stay) so as to allow a third party to proceed with foreclosure against any material assets of the Borrower; (h) the Debtor's filing of (or supporting another party in the filing of) a motion seeking entry of, or the entry of an order by the Bankruptcy Court, granting any super-priority claim or lien (except as contemplated herein) which is senior to or *pari passu* with the DIP Facility; (i) the Debtor's filing of a motion seeking entry of an order approving any key employee incentive plan, employee retention plan, or comparable plan without the DIP Lender's consent; (j) the entry of an order surcharging any of the DIP Collateral under sections 105, 506(c), or any other section of the Bankruptcy Code, or allowing any administrative expense claim having priority over or ranking in parity with the DIP Claims or the rights of the DIP Lender, or resulting in the marshaling of any of the DIP Collateral; (k) any action by the Debtor to challenge the rights and remedies of the DIP Lender under the DIP Facility in the Chapter 11 Case or acting in a manner inconsistent

- 18 -

with the DIP Documents or to avoid or require disgorgement by the DIP Lender of any amounts received with respect to the obligations under the DIP Facility; (l) entry of an order without the express written consent of the DIP Lender obtaining additional financing from a party other than the DIP Lender under section 364(d) of the Bankruptcy Code except if such financing contemplates either ordinary course insurance finance or payment in full of the DIP Facility; (m) the making of any material payments with respect to pre-petition obligations other than as permitted by the Interim Order or this Final Order, as permitted by any "first day," "second day," or other orders of the Bankruptcy Court reasonably satisfactory to the DIP Lender, or as otherwise agreed to by the DIP Lender, and in each case as set forth in and otherwise consistent with the approved Budget; (n) the cessation of the DIP Liens or the DIP Claims to be valid, perfected, and enforceable in all respects; (o) making any payments or distributions not described in the Budget in excess of the Permitted Variances (as defined below) without written consent of or waiver by the DIP Lender; (p) any uninsured judgments are entered with respect to any post-petition non-ordinary course claims against the Debtor; (q) the Debtor asserting any right of subrogation or contribution until all borrowings under the DIP Facility are paid in full and the commitments are terminated; (r) the allowance of any claim or claims under section 506(c) of the Bankruptcy Code or otherwise against the DIP Lender; (s) the entry of an order in the Chapter 11 Case avoiding or requiring repayment of any portion of the payments made on account of the DIP Obligations owing under the DIP Documents, the Interim Order, or this Final Order; (t) an order having been entered by the Bankruptcy Court prohibiting, limiting, or restricting the right of the DIP Lender to credit bid, under section 363(k) of the Bankruptcy Code, for any or all of the Debtor's assets; (u) the Debtor seeking to, or supporting any other person's motion to disallow in whole or in part the DIP Obligations, challenge the validity and enforceability of the DIP Liens, or contest any material provision of any DIP Document; and (v) any lender other than the DIP Lender providing any commitments or funding, including DIP commitments or loans in connection with any DIP

- 19 -

4995-2284-6344

4899-3911-8472, v. 2

facility, unless such commitments or loans provide for payment in full of the outstanding amount of the DIP Obligations owing to the DIP Lender.

15. **Chapter 11 Case Milestones**. The Debtor shall comply with the following milestones, each of which may only be extended or waived by the DIP Lender in its sole and absolute discretion (the "**Milestones**"). To the extent such Milestones require the delivery, filing, or entry of an order with respect to any document, pleading, or order, such document, pleading, or order, as applicable, shall be in form and substance acceptable to the DIP Lender (a) the Bankruptcy Court shall have entered the Interim Order no later than December 31, 2025; (b) the Bankruptcy Court shall have entered this Final Order no later than January 22, 2026; (c) the Bankruptcy Court shall have entered the Bidding Procedures Order, if any, no later than December 31, 2025; (d) the bid deadline pursuant to the Bidding Procedures Order, if any, shall be no later than December 31, 2025; (e) the Bankruptcy Court shall have entered an order setting a hearing on the Debtor's motion to sell or an auction, pursuant to the Bidding Procedures Order (if any), no later than January 22, 2026; (f) the Bankruptcy Court shall have entered one or more sale order(s) approving the sale or if an auction, each of the winning bid(s) resulting from such sale(s), no later than January 23, 2026 (the "**Sale Order**"); and (g) subject to the Bankruptcy Court's entry of a Sale Order, closing of the winning bid(s) shall occur no later than February 16, 2026.

16. **Representations and Warranties**. The Borrower represents and warrants to the DIP Lender that (a) the execution of the DIP Term Sheet and the DIP Loan Documents, if requested or required by the DIP Lender, has been or will be duly authorized, validly executed, and delivered by the Borrower and constitutes its legal, valid, and binding obligation, enforceable against it in accordance with its terms; and (ii) the Borrower has no subsidiaries and does not intend to form any subsidiaries.

17. **Affirmative and Negative Covenants**. The Borrower shall (a) promptly deliver to the DIP Lender and the DIP Lender's counsel, in accordance with any bidding procedures, copies of any term sheets, proposals, presentations, amendments to any asset

- 20 -

purchase agreement(s) or other documents, from any party, related to the restructuring of the Debtor or the sale of assets of the Debtor; (b) comply with all laws (including without limitation, the Bankruptcy Code, ERISA, environmental laws, OFAC, money laundering laws, the PATRIOT Act, and other anti-terrorism laws and anti-corruption laws), pay taxes, maintain all necessary licenses and permits and trade names, trademarks, patents, preserve corporate existence, maintain appropriate and adequate insurance coverage and permit inspection of properties, books, and records; (c) maintain a cash management system as required by the Interim Order and this Final Order; (d) comply with the Chapter 11 Case Milestones; (e) deliver the Budget, updated as described herein, and adhere to the Budget; (f) subject to the Budget, not incur or assume any additional debt or contingent obligations with respect to the debt, give any guaranties with respect to the debt, create any liens, charges, or encumbrances or incur additional material lease obligations, in each case, beyond the agreed upon limits; not merge or consolidate with any other person, change the nature of business or corporate structure or create or acquire new subsidiaries, in each case, beyond to be agreed upon limits; not amend its charter or by laws; not sell, lease or otherwise dispose of assets (including, without limitation, in connection with a sale leaseback transaction) outside the ordinary course of business and beyond to be agreed upon limits; not give a negative pledge on any assets in favor of any person other than the DIP Lender for the benefit of the DIP Lender; and not permit to exist any consensual encumbrance on the ability of any subsidiary to pay dividends or other distributions to the Borrower; in each case, subject to customary exceptions or baskets as may be agreed; (g) other than the DIP Obligations or as otherwise set forth in the Interim Order or this Final Order, not prepay, redeem, purchase, defease, exchange, or repurchase any debt or amend or modify any of the terms of any such debt or other similar agreements entered into by the Debtor; (h) not make or commit to make any payments with respect to warrants, options, repurchase of stock, dividends, or any other distributions, (i) not make, commit to make, or permit to be made any bonus payments to executive officers of the Debtor and their

- 21 -

subsidiaries in excess of the amounts set forth in the Budget; (j) not permit any change in ownership or control of the Debtor or any subsidiary or any change in accounting treatment or reporting practices without the prior consent of the DIP Lender, except as required by GAAP or as permitted or contemplated by the DIP Facility; and (k) without the prior written consent of the DIP Lender (at the direction of the DIP Lender), not make or permit to be made any change to the Interim Order or this Final Order; not seek authorization for, and not permit the existence of, any claims other than that of the DIP Lender entitled to super-priority under section 364(c)(1) of the Bankruptcy Code that is senior or *pari passu* with the DIP Lender's section 364(c)(1) claim, except for the Carve-Out.

18. **Budget; Variance Reporting**. The DIP Lender shall receive an extended weekly budget and variance reporting, in each case commencing with the week during which the Interim Order is entered, in accordance with the DIP Orders and in form and substance satisfactory to the DIP Lender. The variance reporting shall be provided no later than 5 p.m. (Mountain Standard Time) on the Tuesday following the week for which such report covers. The DIP Lender shall also receive, in each case in form and substance satisfactory to the DIP Lender, financial reporting and other customary weekly reporting requirements for similar debtor-in-possession financings. The Debtor shall not cause cash disbursements for operating expenses in the approved Budget to materially deviate upward (cumulative of all operating expense line items) by greater than twelve and one-half percent (12.5%) (the "**Permitted Variances**").

19. **Other Reporting Requirements**. The DIP Lender shall receive, in each case in form and substance satisfactory to the DIP Lender, financial reporting and other customary reporting requirements for similar debtor-in-possession financings and others determined by the DIP Lender in its sole and absolute discretion to be appropriate to the transactions contemplated herein, including, without limitation, with respect to material adverse events, events and notices under other material debt instruments, litigation, contingent liabilities, ERISA or environmental events.

- 22 -

20. **Due Diligence Access**. The Borrower shall provide, and shall direct its respective advisors and other representatives to provide, due diligence items reasonably required by the DIP Lender in connection with the entry by the parties into the DIP Term Loan and the security interests as herein provided. Upon request, the Borrower shall furnish supplemental information or documentation which the DIP Lender or its respective counsel reasonably deems necessary in connection with the DIP Facility.

21. **Carve-Out**. The Carve-Out shall be, collectively, (a) all fees required to be paid to the Clerk of the Bankruptcy Court and to the U.S. Trustee pursuant to 28 U.S.C. §1930(a) plus interest at the statutory rate, if any, pursuant to 31 U.S.C. § 3717 (without regard to the Carve-Out Trigger Notice (as defined below)); and (b) to the extent allowed at any time, all accrued unpaid fees and expenses of the professionals retained by the Debtor and, subject to amounts set forth in any approved budget that (i) are incurred on or prior to the two (2) Business Days succeeding the date of delivery of the Carve-Out Trigger Notice (as defined below), or (ii) are incurred after the second (2nd) Business Day succeeding the date of delivery of a Carve-Out Trigger Notice (as defined below), subject to an aggregate cap (for all fees included in (ii)) of $25,000 for the Debtor's professionals. "**Carve-Out Trigger Notice**" shall mean a written notice delivered by the Administrative Agent on behalf of the DIP Lender to the Debtor's lead counsel and the U.S. Trustee, which notice may only be delivered following the occurrence and during the continuation of an Event of Default under the DIP Facility.

22. **Indemnification and Reimbursement of Expenses**. The Borrower shall pay (a) all costs and expenses incurred by the DIP Lender (including reasonable and documented out-of-pocket fees and disbursements of Snell & Wilmer LLP), in each case incurred in connection with the DIP Facility, and the preparation, execution, delivery, and administration of the DIP Term Sheet and any amendments, modifications, or waivers of the provisions hereof; and (b) all costs and expenses incurred by the DIP Lender, including the reasonable and documented out-of-pocket fees, charges, and disbursements of counsel

- 23 -

for the DIP Lender, in connection with the preservation, enforcement, or protection of any rights or remedies (i) in connection with the DIP Facility or DIP Term Sheet (including all such reasonable and documented out-of-pocket costs and expenses incurred during any legal proceeding, including any proceeding under any debtor relief laws), or (ii) in connection with the DIP Term Loan to be made hereunder, including all such reasonable and documented out-of-pocket costs and expenses incurred during any workout, restructuring, or negotiations with respect to the DIP Term Loan. The Borrower shall defend, protect, indemnify, pay, and hold harmless the DIP Lender and each of its respective officers, directors, affiliates, attorneys, employees and agents (each an "**Indemnified Party**") for and from and against any and all claims, demands, liabilities, obligations, losses, damages, penalties, fines, actions, judgments, suits, fees, costs, charges, expenses, and disbursements of any kind or nature whatsoever (including reasonable and documented out-of-pocket fees and disbursements of one outside counsel) arising out of or in any way relating to or as a consequence, direct or indirect, of (a) the DIP Facility, including the DIP Term Sheet, any documents or instruments relating thereto, and/or the transactions contemplated hereby or thereby; (b) any action or failure to act or action taken only after delay or the satisfaction of any conditions by any Indemnified Party in connection with and/or relating to the negotiation, execution, delivery, or administration of the DIP Term Sheet, the DIP Facility established hereunder, any documents or instruments relating thereto, and/or the transactions contemplated hereby; (c) the Borrower's failure to observe, perform, or discharge any of its covenants, obligations, agreements, or duties under or breach of any of the representations or warranties made in the DIP Term Sheet; (d) the enforcement of any of the rights and remedies of the DIP Lender under the DIP Term Sheet and any documents or instruments relating thereto; (e) any threatened or actual imposition of fines or penalties, or disgorgement of benefits, for violation of any anti-terrorism law by the Borrower; and (f) any claim, litigation, proceeding, or investigation instituted or conducted by any governmental body or instrumentality or any other person

- 24 -

with respect to any aspect of, or any transaction contemplated by, or referred to in, or any matter related to, the DIP Facility including the DIP Term Sheet, any documents or instruments relating thereto, whether or not the DIP Lender is a party thereto; except to the extent any portion of such claims, demands, liabilities, obligations, losses, damages, penalties, fines, actions, judgments, suits, fees, costs, charges, expenses, and disbursements are found by a final and non-appealable decision of a court of competent jurisdiction to have resulted from such Indemnified Party's gross negligence or willful misconduct. The foregoing reimbursement and indemnification obligations of the Borrower shall survive the payment in full of the DIP Obligations, the termination of the DIP Facility and the resignation or removal of the DIP Lender. All out-of-pocket accrued and unpaid fees, costs, disbursements, and expenses of the DIP Lender, including the fees and expenses of Snell & Wilmer LLP as counsel to the Administrative Agent and a DIP Lender, incurred in connection with the DIP Facility and the Chapter 11 Case shall accrue and be added to the DIP Obligations, due upon the occurrence of a Termination Event.

23. **Amendments**. No amendment or waiver of any provision of the DIP Term Sheet or the DIP Documents, if any, and no consent to any departure by the Borrower or the DIP Lender therefrom, shall be effective unless in writing and agreed by DIP Lender and the Borrower (which may be in the form of an email or other written communication and which may come from primary counsel to the DIP Lender, DIP Lender itself, or the Borrower, as applicable) such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.

24. **Release**. The Borrower, for itself, its bankruptcy estate, and its successors, assigns, parents, subsidiaries, affiliates, predecessors, employees, agents, heirs, and executors, as applicable, hereby fully and unconditionally releases each DIP Lender, and their respective directors, officers, employees, subsidiaries, affiliates, attorneys, agents, representatives, successors, and assigns (collectively, the "**Released Parties**") from any and all claims, causes of action, costs or demands of whatever kind or nature, whether

- 25 -

known or unknown, liquidated or unliquidated, fixed or contingent, asserted or unasserted, foreseen or unforeseen, or matured or unmatured, which the Borrower may have had against the Released Parties by reason of any act or omission on the part of the Released Parties occurring prior to the date hereof, in each case regarding or relating to the DIP Term Sheet, the DIP Facility, or any document or instrument relating thereto (collectively, the "**Released Matters**"). This Final Order includes a customary release of the DIP Lender, with respect to the Released Matters and any and all claims and causes of action arising from or related to the DIP Facility.

25. **Bar Against Surcharge**. Upon the entry of this Final Order, Debtor and its bankruptcy estate, and any trustee appointed in any of this case, if any, shall be barred from seeking to recover any costs or expenses or surcharges from the DIP Collateral under any legal theory, including sections 105(a), 363, 364, 506(c), 510, or 552(b) of the Bankruptcy Code.

26. **Authorization to Use Proceeds of DIP Facility, Including Cash Collateral**. Subject to the terms and conditions of the Interim Order, this Final Order, and the DIP Documents (if applicable) (a) the Debtor is authorized to use proceeds of the DIP Term Loan; and (b) the Debtor is authorized to use all Cash Collateral, and the Debtor shall be enjoined and prohibited from, at any time, using proceeds of DIP Term Loan or Cash Collateral except in accordance with the terms and conditions of the Interim Order, this Final Order, and the DIP Documents (if applicable). The Debtor's right to use proceeds of the DIP Term Loan, DIP Collateral, and Cash Collateral shall terminate (i) automatically upon the occurrence of the DIP Termination Date; or (ii) immediately upon notice to such effect by the Administrative Agent to the Debtor after the occurrence and during the continuance of an Event of Default.

27. **Automatic Post-Petition Lien Perfection**. The Interim Order and this Final Order shall be sufficient and conclusive evidence of the validity, enforceability, perfection, and priority of the DIP Liens without the necessity of (a) filing or recording any financing

- 26 -

statement, deed of trust, mortgage, or other instrument or document which may otherwise be required under the law of any jurisdiction; (b) obtaining consents from any landlord, licensor, or other party in interest; (c) complying with any requirement, under the Uniform Commercial Code or otherwise, to specifically identify any commercial tort claim; or (d) taking any other action to validate or perfect the DIP Liens or to entitle the DIP Liens to the priorities granted herein. Notwithstanding the foregoing, the Administrative Agent may in its sole discretion, file financing statements, mortgages, security agreements, notices of liens, and other similar documents, and is hereby granted relief from the automatic stay of section 362 of the Bankruptcy Code in order to do so, and all such financing statements, mortgages, security agreements, notices, and other agreements or documents shall be deemed to have been filed or recorded at the time of and on the Petition Date. Unless otherwise ordered by the Bankruptcy Court, the Debtor shall execute and deliver to the Administrative Agent all such financing statements, mortgages, notices, and other documents as such parties may reasonably request to evidence, confirm, validate, perfect, or to insure the contemplated priority of, the DIP Liens granted pursuant hereto. Without limiting the foregoing, the Administrative Agent may in its sole discretion, file a photocopy of the Interim Order and this Final Order as a financing statement with any recording officer designated to file financing statements or with any registry of deeds or similar office in any jurisdiction in which the Debtor has real or personal property, and in such event, the subject filing or recording officer shall be authorized to file or record such copy of the Interim Order and this Final Order. Any provision of any lease, loan document, easement, use agreement, proffer, covenant, license, contract, organizational document, or other instrument or agreement that requires the payment of any fees or obligations to any governmental entity or non-governmental entity in order for the Debtor to pledge, grant, mortgage, sell, assign, or otherwise transfer any fee or leasehold interest or the proceeds thereof or other DIP Collateral, is and shall be deemed to be inconsistent with the provisions of the Bankruptcy Code, and shall have no force or effect with respect to the

- 27 -

liens on such leasehold interests or other applicable DIP Collateral or the proceeds of any assignment and/or sale thereof by the Debtor, in favor of the DIP Lender in accordance with the terms of the Interim Order and this Final Order.

28. **Proceeds of Subsequent Financing**. Without limiting the provisions and protections above, if at any time prior to the payment in full of the DIP Obligations (including subsequent to the confirmation of a Plan), the Debtor's estate, any trustee, any examiner with enlarged powers or any responsible officer subsequently appointed, shall obtain credit or incur debt pursuant to sections 364(b), 364(c), 364(d), or any other provision of the Bankruptcy Code in violation of the Interim Order or this Final Order, then all of the cash proceeds derived from such credit or debt and all Cash Collateral shall immediately be turned over to the Administrative Agent, until payment in full of the DIP Obligations.

29. **Disposition of DIP Collateral**. The Debtor shall not sell, transfer, lease, encumber or otherwise dispose of any portion of the DIP Collateral without the prior written consent of the DIP Lender (and no such consent shall be implied from any other action, inaction, or acquiescence by any DIP Lender or any order of the Bankruptcy Court), except for sales of inventory in the ordinary course of business or except as otherwise permitted in the Interim Order and this Final Order and approved by the Bankruptcy Court to the extent required under applicable bankruptcy law. Except to the extent otherwise expressly provided herein, all proceeds from the sale, transfer, lease, encumbrance, or other disposition of any DIP Collateral shall be remitted to the Administrative Agent until payment in full of the DIP Obligations.

30. **Effect of Dismissal**. If any order dismissing the Chapter 11 Case (under section 1112 of the Bankruptcy Code or otherwise) is at any time entered, (i) such order shall have no effect on the validity and enforceability of the DIP Liens granted pursuant to the Interim Order, this Final Order, and the DIP Documents, if any, and the DIP Liens shall continue in full force and effect and shall maintain their priorities as provided in the Interim

- 28 -

Order and this Final Order until all DIP Obligations have been indefeasibly paid in full, and all DIP Liens, shall, notwithstanding such dismissal, remain binding on all parties in interest; and (ii) the Bankruptcy Court shall retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing such DIP Liens.

31.     **Modification of Final Order**.  Based on the findings set forth in this Final Order and in accordance with section 364(e) of the Bankruptcy Code, which is applicable to the DIP Facility, in the event any or all of the provisions of this Final Order are hereafter reversed, modified, vacated, or stayed by a subsequent order of the Bankruptcy Court or any other court, the DIP Lender shall be entitled to the protections provided in section 364(e) of the Bankruptcy Code, and no such reversal, modification, vacatur, or stay shall affect (i) the validity, priority, or enforceability of any DIP Protections granted or incurred prior to the actual receipt of written notice by the Administrative Agent of the effective date of such reversal, modification, vacatur, or stay; or (ii) the validity or enforceability of any lien or priority authorized or created hereby.  Notwithstanding any such reversal, modification, vacatur, or stay, any DIP Protections incurred or granted by the Debtor prior to the actual receipt of written notice by the Administrative Agent of the effective date of such reversal, modification, vacatur, or stay shall be governed in all respects by the original provisions of this Final Order, and the DIP Lender shall be entitled to all of the DIP Protections and all other rights, remedies, liens, priorities, privileges, protections, and benefits granted in section 364(e) of the Bankruptcy Code, the Interim Order, this Final Order, and pursuant to the DIP Documents (if applicable).

32.     **Survival of Final Order**.  The provisions of the Interim Order, this Final Order, and the DIP Documents (if applicable), any actions taken pursuant hereto or thereto, all of the DIP Protections, and all other rights, remedies, liens, priorities, privileges, protections, and benefits granted to the DIP Lender shall survive, and shall not be modified, impaired, or discharged by, the entry of any order confirming any plan of reorganization in the Chapter 11 Case, converting the Chapter 11 Case to a case under Chapter 7,

- 29 -

4905-2284-6344

4899-3911-8472, v. 2

dismissing the Chapter 11 Case, withdrawing the reference of the Chapter 11 Case, or providing for abstention from handling or retaining of jurisdiction of the Chapter 11 Case in the Bankruptcy Court, or by any other act or omission. The terms and provisions of this Final Order, including all of the DIP Protections, and all other rights, remedies, liens, priorities, privileges, protections, and benefits granted to the DIP Lender shall continue in full force and effect notwithstanding the entry of any such order, and such DIP Protections shall continue in these proceedings, and shall maintain their respective priorities as provided by this Final Order. The DIP Obligations shall not be discharged by the entry of an order confirming any Plan, the Debtor having waived such discharge pursuant to section 1141(d)(4) of the Bankruptcy Code.

33. **Binding Effect**. The provisions of this Final Order, including all findings herein, and the Interim Order and DIP Documents (if applicable) shall be binding upon all parties in interest in the Chapter 11 Case, including, without limitation, the DIP Lender, any Committee, and the Debtor and its respective successors and assigns (including any Chapter 7 or Chapter 11 trustee hereinafter appointed or elected for the Debtor's estate, an examiner appointed pursuant to section 1104 of the Bankruptcy Code, or any other fiduciary or responsible person appointed as a legal representative of the Debtor or with respect to the property of the estate of the Debtor), whether in the Chapter 11 Case, in any successor case, or upon dismissal of the Chapter 11 Case or any such successor case; provided, however, that the DIP Lender shall have no obligation to permit the use of Cash Collateral or to extend any financing to any Chapter 7 or Chapter 11 trustee or other responsible person appointed for the estate of the Debtor in the Chapter 11 Case or any successor case.

34. **No Waiver**. Neither the failure of the DIP Lender to seek relief or otherwise exercise its respective rights and remedies under the Interim Order, this Final Order, or the DIP Loan Documents (if applicable), or otherwise (or any delay in seeking or exercising same), shall constitute a waiver of any of such parties' rights hereunder, thereunder, or

- 30 -

otherwise. Except as expressly provided herein, nothing contained in the Interim Order or this Final Order (including, without limitation, the authorization of the use of any Cash Collateral) shall impair or modify any rights, claims, or defenses available in law or equity to the DIP Lender, including, without limitation, rights of a party to a swap agreement, securities contract, commodity contract, forward contract, or repurchase agreement with the Debtor to assert rights of setoff or other rights with respect thereto as permitted by law (or the right of the Debtor to contest such assertion). Except as prohibited by this Final Order, the entry of this Final Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, or otherwise impair the DIP Lender under the Bankruptcy Code or under non-bankruptcy law, to (i) request conversion of the Chapter 11 Case to a case under Chapter 7 of the Bankruptcy Code, dismissal of the Chapter 11 Case, or the appointment of a trustee in the Chapter 11 Case; (ii) propose, subject to the provisions of section 1121 of the Bankruptcy Code, any Plan with respect to the Debtor; or (iii) exercise any of the rights, claims, or privileges (whether legal, equitable, or otherwise) of the DIP Lender.

35. **No Third-Party Rights**. Except as explicitly provided for herein, this Final Order does not create any rights for the benefit of any third party, creditor, equity holder, or any direct, indirect, or incidental beneficiary. In determining to make any loan or financial accommodation or to permit the use of Cash Collateral or in exercising any rights or remedies as and when permitted pursuant to this Interim Order or the DIP Documents (if applicable), the DIP Lender shall not (i) be deemed to be in control of the operations of the Debtor; or (ii) owe any fiduciary duty to the Debtor, its creditors, equity holders or estate.

36. **No Marshaling**. The DIP Lender shall not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the DIP Collateral.

- 31 -

37. **Inconsistency**. In the event of any inconsistency between the terms and conditions of the Interim Order or the DIP Documents (if applicable) and this Final Order, the provisions of this Final Order shall govern and control.

38. **Enforceability**. This Final Order shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 and shall take effect and be fully enforceable immediately upon execution hereof. Notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), 6006(d), 7062, or 9024 or any other Bankruptcy Rule, or Rule 62(a) of the Federal Rules of Civil Procedure, this Final Order shall be immediately effective and enforceable upon its entry, and there shall be no stay of execution or effectiveness of this Final Order.

39. **Headings**. Paragraph headings used herein are for convenience only and are not to affect the construction of or to be taken into consideration in interpreting this Final Order.

40. **Retention of Jurisdiction**. The Bankruptcy Court has and will retain jurisdiction to enforce this Final Order according to its terms.

<u>**DATED AND SIGNED ABOVE**</u>

4905-2284-6344

4899-3911-8472, v. 2

**EXHIBIT 1[6]**

**SCHEDULE OF PRE-PETITION PERMITTED LIENS**

1.  JP Morgan Chase N.A.

2.  Avatar Arizona Med Portfolio LLC.

| Secured Party | Collateral | Document Description | Recordation Information |
|---|---|---|---|
| Avatar Arizona Med Portfolio LLC | Real Property located at 2920 N. Fourth Street, Flagstaff, AZ | First Priority Deed of Trust, Security Agreement, Assignment of Rents and Fixture Filing | Recorded 12/24/2024 in Coconino County as Document Number 4008904 |
| Avatar Arizona Med Portfolio LLC | Real Property located at 2650 E. Show Low Lake Road, Show Low, AZ; and 620 West Lee Street, Winslow, AZ 86047 | First Priority Deed of Trust, Security Agreement, Assignment of Rents and Fixture Filing | Recorded 12/23/2024 in Navajo County as Document Number 2024-18034 |
| Avatar Arizona Med Portfolio LLC | | UCC-1 | |

3.  Cardinal Health 110, LLC, in an amount not to exceed $600,000.

---

[6] Nothing herein shall be deemed an agreement, admission, finding, or concession by the Debtor, any creditor, or the Debtor's bankruptcy estate as to the extent, validity, and priority of any of the Secured Creditors' interests, and all parties reserve all rights with respect to such issues.

- 33 -

1

**EXHIBIT 2**

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 34 -

4905-2284-6344

4899-3911-8472, v. 2

| North Country Healthcare, Inc | Projected | Actual[1] | Projected | Projected | Projected |
|---|---|---|---|---|---|
| Cash Projection By Two Week Periods | 1/3/2026 | 1/3/2026 | 1/17/2026 | 1/31/2026 | 2/14/2026 |
| Versus Actual Cash Flows | 1/16/2026 | 1/9/2026 | 1/30/2026 | 2/13/2026 | 2/27/2026 |
| **Beginning Cash Balance** | **594,741** | **1,613,559** | **212,528** | **1,170,334** | **471,666** |
| **INFLOWS** | **2,179,000** | **833,702** | **2,446,500** | **2,098,000** | **2,527,500** |
| *Check* | | | | | |
| Outflows - Payroll NonFed | (1,010,000) | - | (1,010,000) | (1,010,000) | (1,010,000) |
| Outflows - Payroll Fed et al | (455,000) | (463,591) | (467,000) | (455,000) | (467,000) |
| Outflows - NonPayroll | (1,396,213) | (73,673) | (711,694) | (1,331,668) | (698,610) |
| **OUTFLOWS** | **(2,861,213)** | **(537,264)** | **(2,188,694)** | **(2,796,668)** | **(2,175,610)** |
| | TRUE | | TRUE | TRUE | TRUE |
| **IntraAccount Transfers** | **-** | **-** | **-** | **-** | **-** |
| **NET CASH FLOW** | **(682,213)** | **296,438** | **257,806** | **(698,668)** | **351,890** |
| DIP LOAN DRAW | 300,000 | - | 700,000 | - | - |
| DIP LOAN OUTSTANDING | 300,000 | | 1,900,000 | 1,900,000 | 1,900,000 |
| **NET CASH FLOW AFTER DIP DRAW** | **(382,213)** | **296,438** | **957,806** | **(698,668)** | **351,890** |
| **Add BMO Ending** | | | | | |
| **Other** | | **(75)** | | | |
| **Ending Balance Calculated** | **212,528** | **1,909,922** | **1,170,334** | **471,666** | **823,556** |
| | | **-** | | | |
| **Ending Cash Balance (excluding brokerage accounts)** | | **1,909,921.95** | | | |
| Operating #4337 | | 791.14 | | | |
| Operating #3385 | | 293,002.88 | | | |
| Payroll #8904 | | 515,870.59 | | | |
| Savings #1817 | | 1,100,257.34 | | | |
| BMO | | - | | | |

**Note: Actual[1]** Represents 1 week of 2 weeks actual activity.

| Cash Inflows | Projected 1/3/2026 | Projected 1/17/2026 | Projected 1/31/2026 | Projected 2/14/2026 | |
|---|---|---|---|---|---|
| **Crosswalk** | **1/16/2026** | **1/30/2026** | **2/13/2026** | **2/27/2026** | |
| **Operating #4337** | | | | | |
| ContPharm | 180,000 | 180,000 | 180,000 | 180,000 | |
| Dental | 10,000 | 10,000 | 10,000 | 10,000 | |
| Grants | - | - | - | - | |
| FedGrants 330 | 268,000 | 268,000 | 268,000 | 268,000 | |
| FedGrants GME | | 112,700 | | 112,700 | Check projection |
| Events | - | - | - | - | |
| MCO Perform | - | | - | - | |
| Medical_Dental | 890,000 | 890,000 | 890,000 | 890,000 | |
| AHCCCS Recon | | | | | |
| Other | | | | | |
| **TOTAL #4337** | **1,348,000** | **1,460,700** | **1,348,000** | **1,460,700** | |
| **Prior Projection** | **1,358,000** | **1,470,700** | **1,358,000** | **1,470,700** | |
| **Operating #3385** | | | | | |
| Stop Loss | | | | | |
| ACA SNAP Grant | | | | | |
| Homeless Svcs Grant | | | | | |
| Other | - | - | - | - | |
| Contract Pharma | | | | | |
| Pharma | 10,000 | 10,000 | 10,000 | 10,000 | |
| FSA | - | - | - | - | |
| GC Fee | 81,000 | - | - | 81,000 | |
| Williams HD | - | 48,500 | - | 48,500 | |
| Williams HD TrueUp | | 187,300 | | 187,300 | |
| Dental | | | | | |
| Medical_Dental | 740,000 | 740,000 | 740,000 | 740,000 | |
| Medicare Catchup | | | | | |
| MCO Perform | | | | | |

AHCCCS Recon

DIP Advance

Moved up to #4337

| | | | | |
|---|---|---|---|---|
| **TOTAL #3385** | **831,000** | **985,800** | **750,000** | **1,066,800** |
| **Prior Projection** | **831,000** | **985,800** | **750,000** | **1,066,800** |
| **Other** | | | | |
| **TOTAL INFLOWS** | **2,179,000** | **2,446,500** | **2,098,000** | **2,527,500** |
| **Prior Projection** | **2,189,000** | **2,456,500** | **2,108,000** | **2,537,500** |

Note:

| | | | | Projected | Actual @50% | Projected | Projected | Projected |
|---|---|---|---|---|---|---|---|---|
| **Two Weeks Beginning** | | | | 1/3/2026 | 1/3/2026 | 1/17/2026 | 1/31/2026 | 2/14/2026 |
| **Two Weeks Ended** | | | | 1/16/2026 | 1/9/2026 | 1/30/2026 | 2/13/2026 | 2/27/2026 |
| **CASH OUTFLOWS** | | | | | | | | |
| Payroll (from Tab 3) | NonFed | | | (1,010,000) | - | (1,010,000) | (1,010,000) | (1,010,000) |
| | Fed+401K+Fee | | | (455,000) | (463,591) | (467,000) | (455,000) | (467,000) |
| Locum Tenens and Contract BH | | | S | (63,000) | - | (63,000) | (63,000) | (63,000) |
| AB Staffing | Weekly Invoice Net 30 Contract PT | April | | (8,000) | - | (8,000) | (8,000) | (8,000) |
| All Medical | | | | - | | - | - | - |
| Ascend Health | | John | | (55,000) | - | (55,000) | (55,000) | (55,000) |
| Health Insurance | | | S | (442,936) | (8,490) | (22,100) | (336,240) | (17,400) |
| BCBS Premium | | | | | | | | |
| National Alliance + HNAS (BCI) | | | | | | - | - | |
| Venteur (ICHRA) | | Melinda | | (294,000) | - | | (294,000) | |
| Tokio Marine | | | | | | - | | |
| NYLife | ST LT Disb Life AD&D FMLA Net 30 | Melinda | | (126,000) | - | | (24,000) | |
| VeracityRX (Disclose RX) | | Melinda | | - | | - | - | |
| BenefitED | | Melinda | | - | | - | - | |
| MarshMMA | | | | | | - | | |
| WageWorks FSA | Employee paid | Melinda | | (8,400) | - | (8,400) | (8,400) | (8,400) |
| WageWorks COBRA | | | | | | | | |
| DeltaDental | Employee paid | Melinda | | (9,000) | (8,490) | (9,000) | (9,000) | (9,000) |
| VSP Insurance | Employee paid | Melinda | | (4,699) | - | (4,700) | | |
| Optum EAP | Employer paid | Melinda | | (837) | - | | (840) | |
| United of Omaha | Employee paid | Melinda | | | | | | |
| InHouse Pharmacy COS | 10th | | S | (460,000) | - | (10,000) | (460,000) | (10,000) |
| Cardinal | | Caitlin | | (450,000) | - | | (450,000) | |
| McKesson | | Caitlin | | (10,000) | - | (10,000) | (10,000) | (10,000) |
| InHouse Pharmacy Expenses | | | S | - | (913) | (600) | (900) | (600) |
| SHA Provider Pay (McKesson) | | Caitlin | | | | (600) | | (600) |

| | | | | | Projected | Actual @50% | Projected | Projected | Projected |
|---|---|---|---|---|---|---|---|---|---|
| Two Weeks Beginning | | | | | 1/3/2026 | 1/3/2026 | 1/17/2026 | 1/31/2026 | 2/14/2026 |
| Two Weeks Ended | | | | | 1/16/2026 | 1/9/2026 | 1/30/2026 | 2/13/2026 | 2/27/2026 |
| **CASH OUTFLOWS** | | | | | | | | | |
| Altium | Prescription packaging etc | | | | | (913) | | (900) | |
| | | | | | | | | | |
| Contract Pharmacy COS | | | | S | (200,000) | - | (200,000) | (200,000) | (200,000) |
| McKesson | | Caitlin | | | (200,000) | - | (200,000) | (200,000) | (200,000) |
| | | | | | | | | | |
| Contract Pharmacy Expenses | | | | S | (5,850) | - | (5,850) | (5,850) | (5,850) |
| Cardin Courier | | Caitlin | | | - | | - | - | - |
| Nuvem (research) | Net 7 (15 with grace) | Caitlin | | | (5,850) | - | (5,850) | (5,850) | (5,850) |
| | | | | | | | | | |
| Clinical Pharmaceuticals | | | | S | (22,000) | - | (22,000) | (22,000) | (22,000) |
| Cardinal or Henry Schein | $11K per week | Adam | | | (22,000) | - | (22,000) | (22,000) | (22,000) |
| | | | | | | | | | |
| Professional Services | | | | S | (6,000) | (12,131) | - | (6,000) | - |
| Propio Language or Bromberg | | Adam | | | (4,000) | (11,400) | | (4,000) | |
| EMERALDARSYS | | Karla | | | (2,000) | (731) | | (2,000) | |
| AnsweringService | | Adam | | | (2,000) | | | (2,000) | |
| NPDB QUERY | | | | | | | | | |
| | | | | | | | | | |
| Clinical Expenses | | | | S | (10,000) | (2,081) | (19,850) | (10,000) | (21,700) |
| Henry Schein Med Supplies | | Adam | | | (10,000) | | (10,000) | (10,000) | (10,000) |
| McKesson Med Supplies | | Adam | | | - | | - | - | - |
| Patterson Dental | | Nadine | | | | (2,081) | (8,000) | | (8,000) |
| Trilogy (Red bag and sharps) | | Adam | | | - | | (1,850) | | (3,700) |
| Shredding (Iron Mountain) | | | | | | | | | |
| | | | | | | | | | |
| Occupancy | | | | S | (27,000) | (11,087) | (28,300) | (27,000) | (28,300) |
| Kingman Rent | 30th | John | | | | | (20,000) | | (20,000) |
| Lake Havasu City Rent | 21st | John | | | (11,100) | (11,087) | | (11,100) | |
| Bullhead City Rent | 30th | John | | | | | - | | - |
| Flagstaff Peds Rent | 30th | John | | | | | (8,300) | | (8,300) |
| University Rent | 21st | John | | | (5,500) | - | | (5,500) | |
| Payson Rent | 21st | John | | | (10,400) | - | | (10,400) | |
| Cortland Rent - Vacated | 24th | John | | | | | - | | - |

| | | | S | Projected | Actual @50% | Projected | Projected | Projected |
|---|---|---|---|---|---|---|---|---|
| Two Weeks Beginning | | | | 1/3/2026 | 1/3/2026 | 1/17/2026 | 1/31/2026 | 2/14/2026 |
| Two Weeks Ended | | | | 1/16/2026 | 1/9/2026 | 1/30/2026 | 2/13/2026 | 2/27/2026 |
| **CASH OUTFLOWS** | | | | | | | | |
| Greenlaw Townhouse | | John | | | | | | |
| | | | | | | | | |
| Occupancy Utilities & Maintenance | | | S | (20,617) | (25,298) | (39,470) | (19,500) | (39,470) |
| PNP Bill Payment | Semi Annual Prop Tax | John | | - | | - | - | - |
| AZ Control (4th Street) | | Adam | | | | (3,500) | | (3,500) |
| Mountain Fresh | 28th | John | | | | (25,500) | | (25,500) |
| Debbie Does Dusting (Payson) | 28th | John | | | | (1,000) | | (1,000) |
| Estrella Laundry | | Adam | | | | (1,100) | | (1,100) |
| Killum Pest Control (Springerville & Show Low) | | Adam | | | | (400) | | (400) |
| Sentry Fire | | Adam | | | | (520) | | (520) |
| AirGas | | | | | | | | |
| LindeGas | | | | | | | | |
| Aegis (Fire monitor Williams & 4th Street) | | | | (1,117) | - | | | |
| Elevator Maintenance (TK Elevator) | 1/1/2026 | | | | | | | |
| Blue Hills Environmental (Springerville) | | | | | (154) | | | |
| Republic Services | | | | | (100) | | | |
| Waste Management | | | | | | | | |
| City of Flagstaff (Misc billing - Landfill) | | | | | (44) | | | |
| City of Kingman | 30th | Adam | | | | (300) | | (300) |
| APS | 1st - 6th | Adam | | | | (2,700) | | (2,700) |
| APS | 14th - 24th | Adam | | (15,000) | (25,000) | (800) | (15,000) | (800) |
| Unisource Electric | | Adam | | | | (3,500) | | (3,500) |
| Unisource Gas | | Adam | | (4,500) | | (150) | (4,500) | (150) |
| Mohave Electric | | | | | - | | | |
| Town of Springerville | | | | | - | | | |
| Navopache | | | | | - | | | |
| | | | | | | | | |
| Commercial Insurance | | | S | (14,288) | (11,154) | (19,207) | (14,288) | (19,207) |
| Selective Insurance | 28th | John | | | (8,607) | (8,600) | | (8,600) |
| Berkshire Hathaway | 24th | John | | | | (8,034) | | (8,034) |
| Philadelphia Ins Com (TMNA) | | John | | | (2,547) | (2,573) | | (2,573) |
| Travelers (Fiduciary) | | John | | | | | | |
| MedPro (Residents Professional) | | John | | (14,288) | - | | (14,288) | |

| | | | Projected | Actual @50% | Projected | Projected | Projected |
|---|---|---|---|---|---|---|---|
| Two Weeks Beginning | | | 1/3/2026 | 1/3/2026 | 1/17/2026 | 1/31/2026 | 2/14/2026 |
| Two Weeks Ended | | | 1/16/2026 | 1/9/2026 | 1/30/2026 | 2/13/2026 | 2/27/2026 |
| **CASH OUTFLOWS** | | | | | | | |
| HIT Technical Services | | S | (78,425) | (571) | (153,817) | (120,790) | (143,583) |
| VVC Holding LLC (Athena ) | 22nd | Scott | | | (75,400) | | (75,400) |
| VVC Holding LLC (Patient Portal) | 22nd | Scott | | | (7,600) | | (7,600) |
| True North | 15th | Scott | | | (49,000) | | (49,000) |
| Dell Services | Net 45 5th | Scott | - | | - | | - |
| Microsoft (Annual) | Calendar Year Billing | Scott | - | | | | |
| Entisys360 (reseller Veam + Crowdstrike +) | | Scott | (14,400) | - | | (14,400) | |
| Entisys360 (Mimecast Email Cyber) | Replaces amount in Microsoft | Scott | | | (14,317) | | (4,083) |
| CareMessage (text to patients) | | Scott | (8,625) | - | | (25,000) | |
| Proper Connections | | Scott | | | | | |
| Vigilant | | Scott | | | | | |
| InDxLogic | | Scott | | | | (6,500) | |
| cStor (purchased by MicroAge) | | Scott | (9,000) | - | | (9,000) | |
| New Innovations (Residency Mgmt SW) | | Scott | - | | | (3,890) | |
| ALD Telecom | | Scott | (6,400) | - | | (6,400) | |
| Frontier Communications | | Scott | (3,000) | (373) | | (3,000) | |
| Century Link / Lumen | | Scott | (7,800) | - | | (7,800) | |
| Verizon | | Scott | (2,400) | - | | (2,400) | |
| ENA Healthcare Services / Zayo (NW services) | | Scott | (9,100) | - | | (9,100) | |
| Modio | Not critical - cancel | Scott | | | | | |
| Qgenda (scheduling) | | Scott | | | | (20,475) | |
| AZValleyTech (NACASA) | Ending in 202512 | Scott | | - | | - | |
| Inovalon | | Scott | | | | | |
| USBankEquip Leases | | Scott | | - | | - | |
| OpenText | | Scott | | | | | |
| SmartSheet | Negotiating to reduce licenses | Scott | (13,500) | - | | | |
| Freed (AI Scribing) | | Scott | (4,200) | - | | (4,200) | |
| Imprivata (SecureLink) | | Scott | | - | | | |
| VISUALUTIONS | | Scott | | | (7,500) | | (7,500) |
| SmartDeploy, LLC | | Scott | | | | | |
| INCOGNEATO | | | | (198) | | | |

| | | | | Projected | Actual @50% | Projected | Projected | Projected |
|---|---|---|---|---|---|---|---|---|
| Two Weeks Beginning | | | | 1/3/2026 | 1/3/2026 | 1/17/2026 | 1/31/2026 | 2/14/2026 |
| Two Weeks Ended | | | | 1/16/2026 | 1/9/2026 | 1/30/2026 | 2/13/2026 | 2/27/2026 |
| **CASH OUTFLOWS** | | | | | | | | |
| Professional Services Legal | | | S | - | - | (56,500) | - | (56,500) |
| AJG BK | | Anne | | | | (40,000) | | (40,000) |
| Gust Rosenfeld | | Anne | | | | (6,500) | | (6,500) |
| Patient Ombudsman | | | | | | (10,000) | | (10,000) |
| US Trustee Quarterly Fees | | | | | | | | |
| | | | | | | | | |
| JPM Chase CC Facility | 22nd - 23rd | John | S | | | - | | - |
| | | | | | | | | |
| Interest & Merchant Fees | | | S | (42,097) | (1,948) | (69,000) | (42,100) | (69,000) |
| Avatar Finl | initiate ~27th | John | | | | (64,800) | | (64,800) |
| Chase LOC | | John | | (40,000) | - | | (40,000) | |
| Vantiv | | | | (2,100) | (1,948) | | (2,100) | |
| USPay | | | | 3 | | | | |
| Merch Svs | | John | | | | (4,200) | | (4,200) |
| Other | | John | S | (2,000) | | (2,000) | (2,000) | (2,000) |
| | | | | | | | | |
| One Time / Non-recurring | | | S | - | - | - | - | - |
| Avatar Finl | Extend | John | | | | | | |
| Del Webb Grant Reimbursement | | Anne | | | | | | |
| Wipfli | Grant related | Denise | | | | | | |
| ACGME | Grant related | Denise | | | | | | |
| SMI Imaging (Grant related) | Grant related | Denise | | | | | | |
| **TOTAL CASH OUTFLOWS** | | | S | **(2,861,213)** | **(537,264)** | **(2,188,694)** | **(2,796,668)** | **(2,175,610)** |
| **NON-PAYROLL CASH OUTFLOWS** | | | | **(1,396,213)** | **(73,673)** | **(711,694)** | **(1,331,668)** | **(698,610)** |

Payroll Worksheet

| | | Actual | Projected | Actual | Projected | Projected | Projected |
|---|---|---|---|---|---|---|---|
| Two Weeks Beginning | | 1/3/2026 | 1/3/2026 | 1/3/2026 | 1/17/2026 | 1/31/2026 | 2/14/2026 |
| Two Weeks Ended | | 1/16/2026 | 1/16/2026 | 1/16/2026 | 1/30/2026 | 2/13/2026 | 2/27/2026 |
| Pay Day | | *1/2/2026* | *1/16/2026* | *1/16/2026* | *1/30/2026* | *2/13/2026* | *2/27/2026* |
| NonFed Payroll | S | - | (1,010,000) | - | (1,010,000) | (1,010,000) | (1,010,000) |
| | | *1/1/2026* | *1/15/2026* | *1/15/2026* | *1/29/2026* | *2/12/2026* | *2/26/2026* |
| Fed Payroll | S | (329,339) | (330,000) | - | (330,000) | (330,000) | (330,000) |
| | | *1/6/2026* | *1/19/2026* | *1/19/2026* | *2/2/2026* | *2/16/2026* | *3/2/2026* |
| 401K | S | (126,400) | (125,000) | - | (125,000) | (125,000) | (125,000) |
| | | *1/7/2026* | *1/20/2026* | *1/20/2026* | *2/3/2026* | *2/17/2026* | *3/3/2026* |
| Datis E3 | S | (7,852) | | | (12,000) | | (12,000) |
| | | *1/2/2026* | *1/16/2026* | *1/16/2026* | *1/30/2026* | *2/13/2026* | *2/27/2026* |
| S  **Total Payroll** | | (463,591) | (1,465,000) | - | (1,477,000) | (1,465,000) | (1,477,000) |
| | | (463,591) | (455,000) | - | (467,000) | (455,000) | (467,000) |